2011 WY 82

**STRONG CONSTRUCTION, INC.,
Appellant (Defendant),**

v.

**CITY OF TORRINGTON,
Appellee (Plaintiff).**

**No. S–10–0171.**

Supreme Court of Wyoming.

May 23, 2011.

Representing Appellant: Douglas W. Weaver, Wheatland, Wyoming.

Representing Appellee: James A. Eddington, Jones & Eddington Law Offices, Torrington, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶1] The City of Torrington filed suit against Strong Construction, Inc., alleging breach of contract based on Strong's failure to supply and install water pump motors that conformed to contract specifications. After a bench trial, the district court entered judgment in favor of the City. Strong challenges the district court's decision. We affirm.

## *ISSUES*

[¶2] Strong presents the following issues:

1. Did the court err when it held Strong Construction breached the agreement with the City of Torrington and awarded the City of Torrington damages and attorney fees?

2. Was the City of Torrington's claim barred by the one year warranty period, pursuant to Article 13.07 of the Standard General Conditions of the construction contract?

3. Is Strong Construction obligated to pay any portion of the judgment attrib-

uted to Baker and Associates' negligence?

The City phrases the issue as follows:

1. Were the trial court's factual findings and legal conclusions supported by the record?

### FACTS

[¶ 3] Strong entered into an Agreement with the City to provide general contracting services on the second phase of a municipal water project. The Agreement incorporated the "Standard General Conditions of the Construction Contract" prepared by the Engineers Joint Contract Documents Committee, No.1910–8 (1996 Edition) (General Conditions). As part of the project, Strong hired subcontractor Kelly–Deines Irrigation to supply and install three submersible water pumps and motors in three separate wells in a well field. Prior to commencement of the work, Strong was required to submit plans and specifications relating to the motors to the City's engineer, Baker & Associates, Inc., for approval.

[¶ 4] The parties' Agreement required Strong to "furnish complete details of the pump and motor [it] intends to provide," including "[e]lectric motor performance and construction data." The Agreement specified that the motors would need to operate at a frequency of 60 hertz and that they would need to be compatible with a "variable frequency drive" (VFD), which would allow the motors to operate within a range of frequencies. The Agreement, however, did not specify the range of frequencies within which the motors would need to operate.

[¶ 5] Strong submitted specifications relating to a Hitachi motor, and Kelly–Deines ultimately supplied and installed Hitachi motors. The district court found that Strong's submittals included a set of seven pages describing specifications relating to the Hitachi motor. However, those seven pages included a document setting forth guidelines relating to a Centripro motor (Centripro Guidelines). The Centripro Guidelines indicated that the motor would operate within a range of 42 to 60 hertz and that the motor had "been used extensively with variable frequency drives."

The submittals were approved by Baker & Associates on March 17, 2005.

[¶ 6] In April of 2005, approximately four weeks before the motors were shipped to Kelly–Deines, the supplier sent revised operational guidelines for the Hitachi motor to Kelly–Deines indicating that the motors could operate only in the range of 55 to 60 hertz. Kelly–Deines, however, did not provide this information to Strong, to the City, or to Baker & Associates. The pumps and motors were installed in the wells in July of 2005, but were not used until March of 2007, after the third phase of the water project was completed. After initial electrical problems with one of the motors, that motor was removed and replaced with the same model of Hitachi motor. The failed motor was sent to the manufacturer, who determined that the type of damage to the motor was consistent with damage that typically occurs when the motor is operated for extended periods at frequencies between 51 and 55 hertz in conjunction with a VFD. Based on the report by the manufacturer indicating a limited operational capacity for the Hitachi motors, Baker & Associates adjusted the operation of the well field to prevent the other motors from failing. The adjustments, however, reduced the efficiency of the well field and limited water production to the City. The City replaced all three Hitachi motors with Pleuger motors that could be operated in a wider range of frequencies, which allowed the City to return to normal operation of the wells.

[¶ 7] The City subsequently filed suit against Strong in district court, and a bench trial was held on February 23 and 24, 2010. The City argued that Strong breached the Agreement by failing to provide motors with the specifications represented in Strong's submittals. These specifications, the City contended, included the Centripro Guidelines indicating that the motor would operate within a range of 42 to 60 hertz. Strong argued that the Hitachi motors met the contract specifications because no range of frequencies was specified in the Agreement and because the motors operated in a range of 55 to 60 hertz, which, according to Strong, was compatible with a VFD. Strong also disputed the City's claim that the contract submittals

included the Centripro Guidelines and the claim that Baker & Associates relied on that document in approving the Hitachi motors. Further, Strong argued that the one-year "Correction Period" for defective work under the General Conditions barred the City's claim against Strong.

[¶ 8]   The district court found that Kelly–Deines provided the Centripro Guidelines to Baker & Associates prior to approval of the project submittals and, further, that Strong was required to submit the information in the Guidelines pursuant to the specifications in the parties' Agreement.   The court also found that, in reliance on the information contained in the Centripro Guidelines, the parties agreed that the motors would have a minimum operating frequency of 42 hertz. The court held that "Strong[,] through its subcontractors[,] breached the contract by providing motors that did not have the performance and construction data as represented in the submittal;  and by providing motors that were incompatible with operation of the variable frequency drive system for this project."   The district court entered judgment in favor of the City and awarded damages equal to the cost of the replacement Hitachi motor and the three Pleuger motors.   Strong appeals the judgment of the district court.

## STANDARD OF REVIEW

[¶ 9]   When reviewing the factual findings of a district court following a bench trial, we apply the following standard of review:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict.   While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record.   Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence.   Findings of fact will not be set aside unless they are clearly erroneous.   A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with

the definite and firm conviction that a mistake has been committed.

*Piroschak* [*v. Whelan*, 2005 WY 26], ¶ 7, 106 P.3d [887,] 890 [ (Wyo.2005) ].   Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004).   Further,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.   We do not substitute ourselves for the trial court as a finder of facts;  instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.* (quotation marks omitted).

*Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010) (quoting *Belden v. Thorkildsen*, 2007 WY 68, ¶ 11, 156 P.3d 320, 323 (Wyo.2007)).   To the extent that this appeal raises questions of law, those questions are reviewed *de novo*.   *Ramsdell v. State*, 2006 WY 159, ¶ 11, 149 P.3d 459, 462 (Wyo.2006).

## DISCUSSION

[¶ 10]   Before we address the district court's conclusion that Strong breached the Agreement with the City, we must review the court's finding that the Centripro Guidelines, indicating that the Hitachi motor would operate in the range of 42 to 60 hertz, were provided to Baker & Associates prior to approval of the project submittals.   Strong contends the district court erred in determining that the Centripro Guidelines were included in the project submittals.   This document was produced at trial and John Baker of Baker & Associates testified that he received the document either from Strong or from Kelly–Deines directly.   According to Strong, however, the evidence presented at trial establishes that this document was never provided with the project submittals.

[¶ 11]   Indeed, Strong presented evidence at trial that raised an issue as to whether the Centripro Guidelines were included in the project submittals provided to Baker & Associates.   First, Strong pointed to the fact that the Centripro Guidelines set forth specifica-

tions relating to a Centripro motor, not a Hitachi motor, and Strong presented testimony relating to the distinctions between the two motors. Second, Strong established that the document was not included in the submittals that Baker & Associates returned to Strong after approving the submittals. Third, Strong noted that other submittals related to the Hitachi motor were stamped by the supplier, Mid–America Pump & Supply, identifying the customer and project relating to the specifications, and that no such stamp appeared on the Centripro Guidelines. Fourth, and finally, Strong presented testimony from Frank Strong and Dave Deines, principals of the contractor and subcontractor, respectively, who each claimed that he did not send the document to Baker & Associates.

[¶ 12] After weighing the evidence, however, the district court found that the preponderance of the evidence established that the Centripro Guidelines were provided to Baker & Associates prior to approval of the submittals:

> The Court finds that Kelly–Deines Irrigation did provide specific electric motor performance and construction data to Baker and Associates as found on page 7 of Plaintiff's Exhibit 3 [the Centripro Guidelines]. The preponderance of the evidence establishes that Mid–America provided that information to Kelly–Deines, and Kelly–Deines in turn provided it to Baker and Associates; and the Court recognizes that Kelly–Deines denies that, but the preponderance shows otherwise.

Under our standard of review, which requires that we assume the evidence of the prevailing party is true and give that party every reasonable inference that can fairly and reasonably be drawn from it, we cannot conclude that the district court's determination was clearly erroneous. The district court did not articulate its reasons for determining that the preponderance of the evidence weighed in favor of Baker & Associates' receipt of the Centripro Guidelines. Nonetheless, after examining the entire record, we are not convinced that a mistake was made. We note that we do not reweigh the evidence or substitute ourselves for the trial

court as the finder of fact. Rather, we defer to the trial court's factual findings unless they are unsupported by the record.

[¶ 13] Based on our review of the record, we find there is ample evidence to support the district court's decision that the Centripro Guidelines were provided to Baker & Associates prior to approval of the project submittals. John Baker testified that Baker & Associates received the document and relied on the information it contained in approving the project submittals. Dave Deines' testimony that he did not provide the document was contradicted by earlier testimony in his deposition, where he admitted that the document had been provided to Baker & Associates. Kevin Price, Vice President of Sales and Services for the distributor of the Hitachi motor, testified that "[t]he only difference [between the Centripro and Hitachi motors] is that the Hitachi can be supplied in 1800 or four-pole speed. The Centripro is manufactured by Hitachi under the same specifications and requirements as the Hitachi two-pole motor." This testimony indicates that it would be reasonable for Strong to provide, and in turn, for Baker & Associates to approve, specifications relating to a Centripro motor despite the fact that a Hitachi motor was supplied. Finally, John Baker testified that all of the project submittals were not received at the same time and that submittals are often sent on a staggered timeline, which may explain why some of the submittals were stamped and returned and others were not. In light of this evidence, we conclude that the district court's factual findings were supported by the evidence and were not clearly erroneous.

[¶ 14] Having concluded that the district court did not err in determining that the Centripro Guidelines were provided to Baker & Associates, we must now review the district court's determination as to the effect of that document on the parties' Agreement. The district court determined that the parties agreed the motor would operate within a range of 42 to 60 hertz based on the specifications set forth in the Centripro Guidelines and concluded that Strong breached the Agreement because it failed to provide a motor conforming to those specifications.

Strong contends that the Agreement simply required the motor to operate at a frequency of 60 hertz and to be compatible with a VFD. Strong contends that it fulfilled its obligations under the Agreement by providing a motor that met the 60 hertz and VFD compatibility criteria. We disagree.

[¶ 15]   The general rules relating to incorporation of plans and specifications into a construction contract are stated as follows:

Where a building contract refers to the plans and specifications and makes them a part of itself, the contract is to be construed as to its terms and scope together with the plans and specifications. Where the plans and specifications are by express terms made a part of the contract, the terms of the plans and specifications will control with the same force as if they were physically incorporated in the very contract itself.

13 Am.Jur.2d *Building and Construction Contracts* § 13 (2010) (footnotes omitted). Further, with regard to incorporation of documents into a contract, the general rule is that "[d]ocuments annexed (attached) to the agreement and those reasonably well identified and incorporated by reference thereto are construed along with the executed agreement." Steven G.M. Stein, *Construction Law,* § 3.10[5][a][ii] (2006) (and cases cited therein); *see also Western Util. Contractors v. City of Casper,* 731 P.2d 24, 26 (Wyo.1986) ("reference in a contract to extraneous writings renders them part of the agreement for indicated purposes") (quoting *Busch Development, Inc. v. City of Cheyenne,* 645 P.2d 65, 70 (Wyo.1982)).

[¶ 16]   The specification criteria in Part 1.2 of Section 11212 of the parties' Agreement required Strong to furnish complete details of the pump and motor it intended to supply and to provide those submittals to Baker & Associates for approval prior to acceptance of the pump and motor for installation. That section also required the submittals to include "[e]lectric motor performance and construction data." The required submittals, in turn, were expressly incorporated into the parties' Agreement pursuant to Article 7 of the Agreement. Under Sections 7.6 and 7.12, respectively, the "Contract

Documents" included the General Conditions and "[a]ll Written Amendments and other documents amending, modifying, or supplementing the Contract Documents pursuant to paragraphs 3.04 of the General Conditions." Paragraph 3.04(B) of the General Conditions states that "[t]he requirements of the Contract Documents may be supplemented ... [in] one or more of the following ways: (i) a Field Order; *(ii) ENGINEER's approval of a Shop Drawing or Sample* ; or (iii) ENGINEER's written interpretation or clarification." (Emphasis added.)

[¶ 17]   We find that the Centripro Guidelines constitute a "Shop Drawing" as that term is defined in the General Conditions and, as a result, we conclude that the Guidelines were incorporated into the Agreement upon Baker & Associates' approval of that document. The General Conditions broadly define "Shop Drawings" to include "[a]ll drawings, diagrams, illustrations, schedules, *and other data or information which are specifically prepared or assembled by or for CONTRACTOR and submitted by CONTRACTOR to illustrate some portion of the Work.*" (Emphasis added.) The Centripro Guidelines included information relating to the minimum and maximum speeds of the motor, ramp-up and ramp-down times, required overload protection, and other pertinent information describing the manner in which the motor should be operated in conjunction with a VFD. Despite the fact that the Centripro Guidelines do not represent a "drawing" in the general sense, the broad definition of a Shop Drawing in the General Conditions encompasses the information submitted in the Guidelines. Further support for this interpretation is found in the provisions of the General Conditions relating to the contractor's responsibility to provide Shop Drawings, which contemplate a broader set of information than is indicated by the terms "drawing" or "illustration." The General Conditions provide as follows:

6.17   *Shop Drawings and Samples*

A.   CONTRACTOR shall submit Shop Drawings to ENGINEER for review and approval in accordance with the acceptable schedule of Shop Drawings and Sample submittals. All submittals will be identi-

fied as ENGINEER may require and in the number of copies specified in the General Requirements. *The data shown on the Shop Drawings will be complete with respect to quantities, dimensions, specified performance and design criteria, materials, and similar data to show ENGINEER the services, materials, and equipment CONTRACTOR proposes to provide and to enable ENGINEER to review the information for the limited purposes required by paragraph 6.17.E.* (Emphasis added.) Finally, we note that the Centripro Guidelines were submitted along with six other documents detailing the design and specifications of the Hitachi motor. Some of these documents included drawings and others did not. It would not be reasonable, however, in light of the definition of a Shop Drawing, to conclude that some of the submittals relating to the Hitachi motors were incorporated into the Agreement, but not others, based on whether the submittals included a drawing or illustration. For the foregoing reasons, we find that the Guidelines, which were approved by Baker & Associates, were incorporated into the parties' Agreement pursuant to Article 7. We conclude that the district court did not err in determining that Strong breached the Agreement with the City by failing to provide motors that conformed to the specifications in the parties' Agreement.

[¶ 18] Addressing Strong's next argument, we must determine whether the City's claim is barred by the repair obligation described in Section 13.07 of the General Conditions. That Section states as follows:

13.07 *Correction Period*

A. If within one year after the date of Substantial Completion or such longer period of time as may be prescribed by Laws or Regulations or by the terms of any applicable special guarantee required by the Contract Documents or by any specific provision of the Contract Documents, any Work is found to be defective, ... CONTRACTOR shall promptly, without cost to OWNER and in accordance with OWNER's written instructions: (i) repair such defective land or areas, or (ii) correct such defective Work or, if the defective Work

has been rejected by OWNER, remove it from the Project and replace it with Work that is not defective, and (iii) satisfactorily correct or repair or remove and replace any damage to other Work, to the work of others or other land or areas resulting therefrom.

. . .

D. CONTRACTOR's obligations under this paragraph 13.07 are in addition to any other obligation or warranty. The provisions of this paragraph 13.07 shall not be construed as a substitute for or a waiver of the provisions of any applicable statute of limitation or repose.

The district court concluded that Section 13.07 did not preclude the City's breach of contract claim against Strong. The court concluded that "[t]his is simply a contract claim, not a warranty claim. In fact no claim is made here that the motor or the installation [were] defective in and of themselves. It's that the motor did not meet the specifications that were represented that it would."

[¶ 19] We agree that Section 13.07 does not preclude the City's breach of contract claim. Section 13.07 sets forth a warranty that the contractor will repair defects for a specified period of time. *See* Stein, *Construction Law,* § 5B.01[2][a][v] (2006). This warranty obligation, however, does not limit the availability of a breach of contract claim. As noted by the district court, the City did not allege that the work was defective. Rather, the City claimed that Strong breached the contract by failing to provide motors that conformed to agreed-upon specifications. Because the City was asserting a breach of contract, as opposed to a breach of warranty, Section 13.07 does not apply to the City's claim. Furthermore, the repair obligation, by its terms, is not limited to one year, but instead applies to defective work that is found "within one year after the date of Substantial Completion *or such longer period of time as may be prescribed by Laws or Regulations.*" (Emphasis added.) Accordingly, even if the City had brought a breach of warranty claim, Section 13.07 would not operate to bar that claim.

[¶ 20] Despite the fact that the City has not asserted any claim relating to defective

work that might engage the repair obligation described in Section 13.07, Strong contends that our determination as to the effect of this provision is controlled by *Mountain View/Evergreen Improvement and Service Dist. v. Casper Concrete Co.*, 912 P.2d 529 (Wyo.1996). In that case, Mountain View sought damages from the contractor, Casper Concrete, for the costs to repair defective work. *Id.* at 530–31. We held that the trial court appropriately dismissed Mountain View's claim because, pursuant to the governing contractual provisions, Mountain View waived its right to file any claims for defective work and did not make any warranty claims until after the one-year warranty period for defective work in the contract expired. *Id.* at 533. However, *Mountain View* is factually distinguishable from the present case.

[¶ 21] First, there is no provision in the Agreement between Strong and the City analogous to the waiver provision in *Mountain View*. The terms of the waiver in *Mountain View* stated as follows:

**Waiver of Claims:**

14.16. The making and acceptance of final payment will constitute:

14.16.1 A waiver of claims by Owner against Contractor, concerning claims arising from unsettled liens, from defective work, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein of any rights with respect to Contractor's continuing obligations under the Contract Documents; and

14.16.2 The nature and acceptance of direct payment will constitute a waiver of all claims by Contractor against Owner.

*Id.* at 532. We concluded that "[o]nce Mountain View made its final payment to Casper Concrete, the waiver provision dictate[d] that Mountain View waived its claims against Casper Concrete for 'defective work from failure to comply with the Contract Documents.'" *Id.* In this case, however, Strong has not called our attention to, and we are not aware of, any provision in the parties'

Agreement that would operate to waive the City's claim.

[¶ 22] Second, in contrast to the present case, the claim asserted in *Mountain View* was governed by the repair obligation in the parties' contract because Mountain View sought damages to compensate for the repair of defective work. As quoted in *Mountain View*, the relevant contractual provision stated as follows:

13.12. If within one year after the date of final acceptance ... any Work is found to be defective, CONTRACTOR [Casper Concrete] shall promptly, without cost to OWNER [Mountain View] and in accordance with OWNER's written instructions, either correct such defective Work, or, if it has been rejected by OWNER, remove it from the site and replace it with nondefective Work.

*Id.* at 531–532 (emphasis omitted). We held that Mountain View's claim must be dismissed because it failed to assert the claim within the one-year limitation period provided in the repair warranty. *Id.* at 533. In this case, because the City did not make a claim based on defective work, the warranty provision does not similarly preclude the City's action. In addition, as noted above, even if the City had made a warranty claim, the repair obligation in Section 13.07 of the Agreement was not limited to one year. Consequently, due to factual differences relating to the nature of the City's claim and the terms of the Agreement between Strong and the City, *Mountain View* does not control our determination as to the effect of the warranty provision in this case.

[¶ 23] Finally, Strong contends the damages awarded by the district court should be apportioned according to the respective degrees of fault of the parties under a negligence theory of liability. After concluding that Strong breached the Agreement with the City, the district court found that several of the parties were negligent. The court allocated fault 60 percent to Kelly–Deines, for which Strong would be vicariously liable, 30 percent to Baker & Associates, and 10 percent to the project electrician. The court, however, did not apportion the

damages.[1] Strong does not contest the determination that its liability to the City was contractual. Nonetheless, Strong argues that the damage award should be reduced by the amount of damages attributable to the negligence of Baker & Associates.

[¶ 24] Strong's first argument with respect to apportionment of damages is that it is not obligated to pay any portion of the judgment attributable to the negligence of Baker & Associates based on Section 6.01 of the parties' Agreement. That Section states as follows:

6.01 *Supervision and Superintendence*

A. CONTRACTOR shall supervise, inspect, and direct the Work competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. CONTRACTOR shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of OWNER or ENGINEER in the design or specification of a specific means, method, technique, sequence, or procedure of construction which is shown or indicated in and expressly required by the Contract Documents. CONTRACTOR shall be responsible to see that the completed Work complies accurately with the Contract Documents.

Strong does not explain how this Section of the Agreement applies to reduce its liability for contract damages. Section 6.01 applies to the engineer's negligence in the "specification of a specific means, method, technique, sequence, or procedure of construction." The breach of contract that occurred here involves Strong's failure to supply the motor identified in the Centripro Guidelines that were approved by Baker & Associates. The approval of that motor did not involve the "specification of a specific means, method, technique, sequence, or procedure of construction." Accordingly, Section 6.01 does not relieve Strong of liability.

[¶ 25] Next, Strong urges this Court to adopt the principles of comparative fault in the context of a claim for breach of contract. However, we have been presented with no cogent argument or pertinent authority suggesting that the tort concept of fault has a counterpart in a breach of contract action, or that contractual damages should be similarly apportioned. Rather, as one recent decision from California explains, contract damages are generally awarded on an all-or-nothing basis:

In order to recover for breach of contract, the nonbreaching party must prove that it has substantially performed the conditions of the breaching party's performance (or that performance was excused). If it fails to do so, it obtains no recovery. If it does establish this predicate, it is entitled to recover all damages foreseeably caused by the other party's breach. (*Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal. App.3d 1051, 1063 [235 Cal.Rptr. 813]; see Rest.2d *Contracts*, § 235, com. b, p. 212 ["[w]hen performance is due, ... anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial"]; III Farnsworth on Contracts (3d ed. 2004) § 12.8, pp. 195–196 ["contract law is, in its essential design, a law of strict liability"].) Thus, contract damages normally are awarded on an all-or-nothing basis. While the breaching party is liable only for damages foreseeably caused by its breach, there is no apportionment of that amount even if less than perfect performance of the conditions by the nonbreaching party contributed in some measure to the loss. (*Bruckman v. Parliament Escrow Corp.*, *supra*, at p. 1063 [235 Cal.Rptr. 813]; see 11 Corbin on Contracts (rev. ed. 2005) § 55.9, pp. 31–32.).

*Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group,* 143 Cal.App.4th

---

1. Although the district court did not apportion damages resulting from the cost of replacement of the Hitachi motors, the court, relying on an indemnification provision in the parties' Agreement, apportioned attorney fees in accordance with its allocations of fault. However, we need not address whether apportionment of attorney fees was appropriate because neither Strong nor the City contests that decision.

1036, 1051, 49 Cal.Rptr.3d 609 (Cal.App. 1st.Dist.2006). The Court of Appeals of New York has also noted the reasons that apportionment of damages does not translate to the realm of contract law:

> Nor are we persuaded that we should create a common-law right of contribution in contract actions.... [T]he need to liberalize the inequitable and harsh rules that once governed contribution among joint tort-feasors—are not pertinent to contract matters. Parties to a contract have the power to specifically delineate the scope of their liability at the time the contract is formed. Thus, there is nothing unfair in defining a contracting party's liability by the scope of its promise as reflected by the agreement of the parties. Indeed, this is required by the very nature of contract law, where potential liability is determined in advance by the parties.

*Board of Education v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 29, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (N.Y.1987). Because we have been presented with no rebuttal to the principles expressed in these authorities, we find no basis in common law to extend apportionment of damages to breach of contract actions.

[¶ 26] Finally, Strong appears to contend that Wyoming's comparative fault statute, Wyo. Stat. Ann. § 1–1–109, provides a statutory basis for apportionment of liability in a breach of contract action. Strong requests that we adopt the reasoning of Justice Cardine's dissent in *Phillips v. Duro–Last Roofing,* 806 P.2d 834 (Wyo.1991), which suggested that the comparative fault statute should be extended to breach of warranty and strict liability actions. However, as noted in the majority opinion in *Phillips,* when interpreting a statute, we look initially and primarily to the words used in the statute to determine legislative intent:

> Statutory interpretation and application addresses review of the perceived legislative intent. With little or nothing more than the specific language of the enactment, we cannot be justified in superimposing over its plain provisions what is not otherwise stated....

> Whenever this court is engaged in the construction of a statute, the primary consideration is to discern the intention of the legislature.... That legislative intent should be ascertained, as nearly as is possible, from the language incorporated in the statute, which is viewed in the light of its object and purpose.... In those instances in which the language in the statute is plain and unambiguous, the words used are to be accorded their plain and ordinary meaning unless there is some manifestation of a legislative intent that they not be accorded the plain and ordinary meaning.

*Id.* at 837 (quoting *Belle Fourche Pipeline Co. v. State,* 766 P.2d 537, 542 (Wyo.1988)) (footnote omitted); *see also Olivas v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2006 WY 29, ¶ 15, 130 P.3d 476, 484 (Wyo. 2006). Although Wyo. Stat. Ann. § 1–1–109 has been extended to strict tort liability and products liability actions since the decision in *Phillips,* the statute does not provide any indication that comparative fault is applicable to a breach of contract action. The statute provides that

> "Fault" includes acts or omissions, ***determined to be a proximate cause of death or injury to person or property,*** that are in any measure negligent, or that subject an actor to strict tort or strict products liability, and includes breach of warranty, assumption of risk and misuse or alteration of a product.

Wyo. Stat. Ann. § 1–1–109(a)(iv) (emphasis added). The comparative fault statute applies to tort claims where a party seeks personal injury or property damages caused by the fault of another. The City, however, did not pursue a claim for personal injury or property damage in this case. The comparative fault statute is not applicable to this breach of contract action.

[¶ 27] Affirmed.