2008 WY 44

Ron RETZ, an individual; Ernest Williams, individually and as trustee for nieces and nephews of the decedent, William C. Rogers; Anne Burwell Williams, individually and as co-trustee for the nieces and nephews of the decedent, William C. Rogers; Fred Crouter, individually and as trustee of the Ada Crouter Trust; and Beverly Crouter, an individual, Appellants (Plaintiffs),

v.

William SIEBRANDT, an individual; Salvador Zarate, an individual; Charles E. Graves, in his capacity as Successor Trustee of the Living Trust of William C. Rogers, deceased, Appellees (Defendants),

and

The University of Wyoming Foundation, a Wyoming nonprofit corporation, Appellee (Nominal Defendant).

No. S–07–0023.

Supreme Court of Wyoming.

April 11, 2008.

Representing Appellants: C.M. Aron, Aron and Henning, LLP, Laramie, Wyoming; and Mattaniah Eytan, Law Offices of Mattaniah Eytan, Corte Madera, California. Argument by Mr. Eytan.

Representing Appellees: Jason M. Tangeman, Jeff Anthony, and Philip A. Nicholas of Anthony, Nicholas & Tangeman, LLC, Laramie, Wyoming, for Appellees William Siebrandt and Salvador Zarate. Paul J. Hickey, Roger C. Fransen, and Brandi L. Monger * of Hickey & Evans, LLP, Cheyenne, Wyoming, for Appellee Charles E. Graves (Trustee). Gregory C. Dyekman and Timothy L. Woznick of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming, for Appellee The University of Wyoming Foundation. Argument by Messrs. Hickey, Tangeman, and Woznick.

Before VOIGT, C.J., and GOLDEN, HILL, and BURKE, JJ, and RYCKMAN, D.J.

VOIGT, Chief Justice.

[¶ 1] Appellants, Ron Retz, Ernest Williams, Anne Burwell Williams, Fred Crouter, and Beverly Crouter, request relief from the district court's grant of two separate motions for summary judgment, the last of which effectively disposed of Appellants' claims against Appellees William Siebrandt,

Salvador Zarate, Charles E. Graves (Trustee), and The University of Wyoming Foundation. Appellants also contest the district court's denial of a motion to amend the complaint. We affirm.

## ISSUES

[¶ 2] 1. Did the district court abuse its discretion in denying Appellants' request for leave to amend the complaint?

2. Did the district court properly grant summary judgment on the claim for breach of contract to make a will and on the claim challenging the validity of the 2002 trust?

Appellants' Notice of Appeal also lists several other issues. Appellants chose not to argue those issues in their briefs and we consider them waived.

## FACTS

[¶ 3] Colonel William C. Rogers (the Colonel) died in Carmel, California, on April 30, 2003. The Colonel was 96 years old, not married at the time of his death, and had no known children. His only marriage was dissolved in 1966 after protracted litigation. During the divorce, the Colonel transferred most of his assets to various members of his immediate family with the apparent goal of keeping his wife from reaching those assets in the divorce. When the divorce was completed, his family returned the Colonel's assets to him. The Colonel ceased contact with his family at some point thereafter. At the time of his death, the Colonel had not maintained contact with his family for more than 30 years. Appellants Anne Burwell Williams and Ernest Williams are the children of two of the Colonel's sisters.

[¶ 4] The Colonel spent some years in Wyoming and Nebraska before moving to California in 1997. By then, the Colonel was unable to walk and required assistance with the daily tasks of life. He lived in several assisted living facilities before purchasing his own home, where he lived during his last years with the help of a caretaker. The

---

* Order Granting Motion Allowing Brandi L. Monger to Withdraw as Counsel entered September 18, 2007.

Colonel's closest companion during this time was Appellee William Siebrandt. Mr. Siebrandt, who had known the Colonel for many years, helped the Colonel manage his significant investments, arranged for his care, and visited him daily. The Colonel's relationship with Siebrandt was a problematic one, and both parties cut off contact with each other several times over the years before the Colonel moved to California. Over the course of their relationship, the Colonel gave Siebrandt a series of generous monetary gifts.

[¶ 5] The Colonel was meticulous in his estate planning. He created a series of instruments, including at least ten separate amended living trusts, over the course of the years. The trusts have minor variations, but all contain a number of individual and charitable bequests and leave the residual estate to the University of Wyoming. The Colonel also donated generously to the University during his life.

[¶ 6] During his life, the Colonel was trustee of his own revocable trust. Upon his death, that responsibility passed to his attorney, Appellee Charles Graves. Mr. Graves sent notice of the Amended Living Trust of William C. Rogers, dated February 16, 2002, to all beneficiaries in June of 2003. Appellants, all of whom are either beneficiaries of the trust or claim some right to assets contained therein, filed the Complaint in this action on April 29, 2005. Appellants alleged, *inter alia*, that the 2002 trust was executed under undue influence, that the trust was forged, that the trust was created in violation of a contract to make a will, and that the Trustee had violated his duty to the trust by refusing to bring suit in California to recover monies Appellants allege were misappropriated before the Colonel's death. Appellees moved for summary judgment, which the district court partially granted on September 12, 2006. After the Motion for Summary Judgment was filed but before the order partially granting summary judgment was entered, Appellants moved to amend their Complaint. The district court denied that motion in part and granted summary judgment for Appellees on the remaining issues on November 28, 2006. This appeal followed.

## DISCUSSION

### A. *The Motion to Amend*

[¶ 7] The law in Wyoming is well settled that the decision to allow amendment to pleadings is vested within the sound discretion of the district court. That decision will be reversed only for an abuse of discretion shown by clear evidence.

Leave to amend pleadings "shall be freely given when justice so requires." We have identified the proper test as to what the trial court should consider when an amendment is proffered to be the following:

If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

*Armstrong v. Hrabal,* 2004 WY 39, ¶ 11, 87 P.3d 1226, 1230–31 (Wyo.2004) (internal citations and quotation marks omitted).

[¶ 8] We cannot find that the district court abused its discretion in denying Appellants leave to amend the Complaint. Several of the above-stated factors, any one of which gives a district court reason to deny amendment of a complaint, were present in this case. Appellants filed their Motion to Amend Complaint on August 22, 2006, more than a year after filing the Complaint, and only days from the court-ordered discovery cut off. At that time, Appellees' Motion for Summary Judgment was still pending. Several of the changes to the Complaint modified claims that were the subject of that summary judgment motion. Appellants also attempted to add new claims that would not be in danger from the pending summary judgment motion. The requested changes would have required significant additional discovery, including retaking depositions, and would have entitled Appellees to further dis-

positive motions.[1] Many of the proposed changes would also have been futile because the district court had already disposed of the underlying issues on summary judgment by the time the motion was decided. The claims that had not yet been decided suffered from the same failures of proof that ultimately led the district court to dismiss summarily the remainder of Appellants' claims as discussed below, and amendment to add them would have been futile. *See infra* ¶¶ 9–13.

[¶ 9] Appellants Anne Burwell Williams and Ernest Williams, the Colonel's estranged niece and nephew, argue that the district court should have allowed them to amend the Complaint to add their claim to have Appellee Charles Graves removed as Trustee. The district court found that this claim was a reiteration of Appellants' earlier request for injunctive relief, requesting that the court require the Trustee to sue Appellees Siebrandt and Zarate in California to recover trust monies Appellants feel were misappropriated. The district court found that Mr. Graves had not abused his discretion as Trustee when it dismissed the former claim, and did not therefore abuse its discretion when it refused to allow Appellants to add another claim based on the same set of facts and allegations.

[¶ 10] Appellants also take issue with the district court's refusal to allow them to amend their Complaint to add claims for the torts of elder abuse and undue influence. Appellants have not made any cogent argument supported by law as to why a Wyoming court should have jurisdiction, or accept venue, over torts allegedly committed in California, by California residents, against another California resident. Nor do Appellants give any reason they would have standing to bring such a claim on behalf of the Colonel personally. The only justification Appellants give in their brief is that the district court stated in its September 12, 2006 decision letter that "[appellants'] concerns can be resolved fully and fairly in the current litigation and without resorting to additional litigation in California." That statement was made in reference to the district court's disposition of Appellants' attempts to force the Trustee to file suit in California. It does not have any bearing on the issues of jurisdiction or standing for tort claims brought directly by Appellants. The district court did not abuse its discretion when it disallowed amendment to include these claims.

■ [¶ 11] Appellants Fred and Beverly Crouter attempted to bring several claims on behalf of their mother, Ada Crouter, the Colonel's long-time friend and companion during his years in Wyoming and Nebraska. First, they contest the district court's denial of their request to amend the Complaint to add several breach of contract claims against Colonel Roger's estate. The district court found, in addition to the timeliness issues, that the claims would be futile, and refused to allow the amendment. The Crouters alleged that the Colonel promised to care for their mother, Ada Crouter. However, Appellants failed to allege any form of consideration for the alleged promise. "Absent some indicia of actual consideration, a contract will be held invalid by the courts." *Miller v. Miller*, 664 P.2d 39, 41 (Wyo.1983). The district court did not abuse its discretion when it denied Appellants' request to add this futile claim to the litigation.

■ [¶ 12] The last claim about which Appellants make specific argument on appeal is the Crouters' claim that the Colonel used a fraudulent document wrongfully to withdraw securities from an account he held jointly with Ada Crouter in 1991. The district court properly denied the request to amend to add this claim because the Crouters could not have prevailed as a matter of law. The statute of limitations on conversion is four years. Wyo. Stat. Ann. § 1–3–105(a)(iv)(B) (LexisNexis 2007). Although Wyoming counts the statute of limitations from the date of discovery of a claim, we have previously held that

> the words 'until the discovery of the fraud' appearing in § 1–18 mean from the time the fraud was known or could have been discovered in the exercise of reasonable

---

1. At the time of the hearing on the Motion to Amend Complaint, the deadline for filing dispositive motions had passed.

diligence. They do not necessarily mean until the party complaining had actual notice of the fraud alleged to have been committed.

*Mason v. Laramie Rivers Co.*, 490 P.2d 1062, 1064 (Wyo.1971).

[¶ 13] Ada Crouter was a joint holder of the account from which the Colonel withdrew the securities in 1991. A simple inquiry at the brokerage would have shown her that the account had been emptied. An account holder is charged with knowledge of the state of her account. *O'Donnell v. Western Nat'l Bank of Casper*, 705 P.2d 1242, 1245 (Wyo.1985). The Complaint in this action was filed on April 29, 2005, more than 13 years after the securities were withdrawn. The district court did not abuse its discretion in refusing the Crouters' request to add this claim.

### B. *Summary Judgment*

[¶ 14] When we review the granting of a summary judgment, we employ the same standards and use the same materials as were employed and used by the trial court. We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. Summary judgment is appropriate only when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which the parties have asserted. We review a

grant of summary judgment deciding a question of law de novo and afford no deference to the trial court's ruling.... We will affirm a grant of summary judgment if it can be sustained on any legal ground appearing in the record.

*Platt v. Creighton*, 2007 WY 18, ¶ 7, 150 P.3d 1194, 1198–99 (Wyo.2007) (citations and quotation marks omitted).

[¶ 15] The district court granted summary judgment on all issues in two separate decision letters. Appellants contest the district court's decision on two of those issues, which we will address here.[2]

### 1. *Contract to Make a Will*

[¶ 16] Appellants Ernest Williams and Anne Burwell Williams claim that the Colonel entered into an agreement with their parents, his sisters, to leave all of his money to his family when he died. In its Order Granting Partial Summary Judgment, the district court dismissed that claim because it found that Appellants were not able to produce any competent evidence[3] to support the allegations contained therein. However, the contract would be unenforceable even if evidence supported its existence. Appellants claim that the Colonel agreed to leave his money to his sisters and their families in exchange for their help in hiding his assets from his then-wife during the divorce. "Generally, a contract which is contrary to public policy will not be recognized by the court, and the parties to such contract will be left as the court finds them." *Tate v. Mountain States Tel. & Tel. Co.*, 647 P.2d 58, 61 (Wyo.1982). It is certainly against public policy in this state to contract to hide assets in order to prevent a court sitting in divorce

---

2. Appellant carries the burden of bringing a complete record to this Court for review. *Stroup v. Oedekoven*, 995 P.2d 125, 129 (Wyo. 1999). Appellants filed several motions and supplements in opposition to the motions for summary judgment, but only designated one of those for inclusion in the record on appeal. Although we review a grant of summary judgment *de novo*, that standard does not alter the fact that we only consider the portions of the record that the parties have properly designated for appellate review. In this case, we have considered

the arguments made and the exhibits cited in the documents we have in the record.

3. The "evidence" filed in this case consists of thousands of pages of poorly organized, often illegible, largely irrelevant, painfully duplicative, and generally unexplained documents. We have addressed the relevant documents cited by the parties amidst this collage. The fact that we review a district court's decision *de novo* in a case for summary judgment does not excuse the parties from proper citation to those portions of the record relevant to their respective arguments.

proceedings from considering all assets when dividing a marital estate. We would decline to enforce such a contract without regard to the evidence presented. The district court acted properly in summarily dismissing this claim.

### 2. *Undue Influence*

[¶ 17] The district court summarily dismissed Appellants' claims that the 2002 trust instrument was either forged or executed under the undue influence of Appellees Siebrandt and Zarate. The district court determined that Appellants had no standing to attack the 2002 trust. In its November 28, 2006 decision letter, the district court reasoned that Appellants had no tangible interest in setting aside the 2002 trust because they would not take any differently under the previous trust instrument. Appellants argue that the proper course of action is to reinstate a will the Colonel executed in 1988, and not the 2000 trust that was the predecessor to the 2002 trust instrument.

[¶ 18] Under Wyo. Stat. Ann. § 4–10–407 (LexisNexis 2007), "a trust is void to the extent its creation was induced by fraud, duress or undue influence." The 2002 trust was the means of revoking the previous (2000) trust instrument. Appellants have presented no evidence showing that any independent revocation of the 2000 trust ever took place. If the portions of the 2002 trust relating to Appellees Siebrant and Zarate were void because of undue influence, the University of Wyoming, as the residual beneficiary, would benefit, and there would be no change in the bequest to Appellants. If the 2002 trust instrument were void in its entirety, and had no legal effect, then the 2000 trust would never have been revoked, and would remain in effect. In that case, the district court reasoned, if Appellants have not presented sufficient evidence to raise an issue of fact as to the validity of the 2000 trust,[4] their claims must fail. The parties have argued this issue extensively in their briefs. However, we may affirm a summary judgment on any grounds supported by the record. *Platt,* 2007 WY 18, ¶ 7, 150 P.3d at 1198–99. Here, we find that the more determinative issue is that Appellants have not raised an issue of material fact as to the validity of any part of the 2002 trust. Therefore, we need not consider what would happen were that trust to be found void in whole or in part.

[¶ 19] In order to establish that a will (or in this case, a testamentary trust) was executed under undue influence, a party must establish:

> (1) the relations between the one charged with exercising the undue influence and the decedent affording the former an opportunity to control the testamentary act; (2) that the decedent's condition was such as to permit * * * subversion of h[is] freedom of will; (3) that there was activity on the part of the person charged with exercising undue influence; and (4) that such person unduly profited as beneficiary under the will.

*In re Estate of Loomis,* 810 P.2d 126, 129 (Wyo.1991).

[¶ 20] Appellees, as movants, bear the initial burden of establishing a *prima facie* case for summary judgment. *In re Estate of McLean,* 2004 WY 126, ¶ 12, 99 P.3d 999, 1004 (Wyo.2004). In support of their Motion for Summary Judgment, Appellees provided a series of testamentary instruments dating back to 1988, all of which show a pattern of bequests similar to those found in the 2002 trust, with bequests to various individuals and a number of bequests to specific charities. The University of Wyoming was the residual beneficiary under all of these instruments. This pattern is consistent with the bequests in the 2002 trust.

[¶ 21] Appellees also provided an affidavit of Trustee Charles Graves, who attested that

---

4. Appellants claim that they could not be expected to attack the 2000 trust, because they were never served with proper notice of that instrument pursuant to Wyo. Stat. Ann. § 4–10–813(b)(iii) (LexisNexis 2007). However, the district court was not enforcing the 2000 trust but instead was attempting to determine what effect the possible invalidity of the 2002 trust would have as a matter of law. Once Appellees argued that a void 2002 trust could not have revoked the previous instrument, Appellants ignored the possibility that the court would accept that reasoning at their peril.

he had known the Colonel for decades, spoke with him on a regular basis, met with him occasionally over the years, and had observed, firsthand, the Colonel's relationship with Appellee Siebrandt. Mr. Graves verified that he drafted the 2002 trust at the Colonel's instruction, that he spoke directly to the Colonel regarding the terms to be added to and removed from the 2000 trust, and that he believed that the document was an expression of the Colonel's wishes, and not those of any other party exerting influence over him. Mr. Graves also explained that he was personally aware that the Colonel transferred a significant amount of money in the form of gifts to Appellee Siebrandt throughout the Colonel's lifetime.

[¶ 22] Appellees also provided deposition testimony from several health care professionals who had known the Colonel over the years. Louanna Blackton, an administrator at the Colonel's assisted living facility from 1997 to 1999, remembered the Colonel and testified that he was a very independent person and that he was always alert and aware. Diane Morton, another administrator, testified that the Colonel was resistant to the level of help he was offered at the facility, that he was extremely intelligent and opinionated, and that he always spoke his mind.

[¶ 23] Appellees submitted the affidavit of Kathie Cuomo, an employee of The University of Wyoming Foundation who met with the Colonel in May of 2002 regarding his gifts to the University. Ms. Cuomo found the Colonel in good health, and in full control of his faculties. She met with the Colonel alone and never met Appellee Siebrandt. Philip Dubois, also of the University, confirmed that he met with the Colonel in 1998 and again in 2000. Mr. Dubois testified that Siebrandt was not present at either visit, and that the Colonel seemed much happier at his home in Carmel in 2000 than he had been at the assisted living facility where he was living during the earlier visit.

[¶ 24] Alejandro Cruz testified that he was the Colonel's primary caregiver until the Colonel's death in 2003. Mr. Cruz described the last years of the Colonel's life, a daily routine that included regular trips to the library (where the Colonel was left alone to study) and frequent visits to the beach, despite the Colonel's confinement to a wheelchair and other medical issues. Mr. Cruz discussed the various choices the Colonel made with respect to his daily activities, testimony that reflects that the Colonel had a very independent lifestyle for a man in his nineties.

[¶ 25] The notary who notarized the 2002 trust also testified in deposition that she remembered the Colonel. She testified that the Colonel seemed alert, that she remembered him being talkative, and that she had no recollection of anyone being with the Colonel that day. The notary recognized the Colonel from a picture on his driver's license at the deposition and confirmed that the person whose picture appeared on that license was, in fact, the person who came to her office to have the trust notarized.

[¶ 26] We find that the district court was correct in finding that Appellees had met their burden under the summary judgment standard. The burden then shifted to Appellants to "present specific and substantiated evidence showing the existence of a material fact" as to undue influence with respect to the trust document. *McLean*, 2004 WY 126, ¶ 15, 99 P.3d at 1004. Appellants failed to produce sufficient admissible evidence to raise such an issue.

[¶ 27] Appellants produced the sworn testimony of Paul J. Barulich, an attorney who met with the Colonel at the assisted care facility in 1998 and reviewed the Colonel's estate documents. Mr. Barulich testified that Appellee Siebrandt was visibly upset that the Colonel was meeting with a lawyer without Siebrandt's knowledge and that the Colonel refused to see Mr. Barulich after their initial meeting. When Mr. Barulich was able to gain admittance to see him, the Colonel remained in bed, refused to look at him, and repeatedly told him to "go away." Mr. Barulich also testified that Siebrandt was in the room during that visit. However, Appellees produced a letter from the Colonel addressed to Mr. Barulich that requested the return of his papers and ordered Mr. Barulich not to complete any work on the Colonel's behalf. Appellees have also produced the testimony of Trustee Charles Graves that

he investigated Mr. Barulich's concerns, that the State of California conducted an independent investigation, and that his concerns about the matter were allayed. Mr. Graves testified that he traveled to California to meet with the Colonel, that he met with the Colonel alone, and that the Colonel explained his displeasure with Mr. Barulich. Mr. Graves then sent Mr. Barulich a letter explaining that he had investigated the matter and informing Mr. Barulich that the Colonel did not wish to receive any further communication from him, and that the Colonel did not intend to pay the bill he received, as he did not believe he had contracted with Mr. Barulich for any billable work.

[¶ 28]  In addition to Mr. Barulich's testimony, Appellants have produced photocopies of reams of correspondence from the Colonel to various people, most of which is illegible. Appellants provided typed versions of these hand-written letters, but failed to give any reason such transcriptions would be admissible in court. This Court does not know who transcribed the letters, and from the limited number of phrases legible to us, it is obvious the transcriptions contain multiple errors and do not accurately reflect the contents of the letters themselves. We have reviewed the portions of the letters that can be deciphered and they show, at best, that the Colonel and William Siebrandt had a problematic relationship over the course of many years. Nothing in these letters in any way proves or disproves the allegations of undue influence with respect to the 2002 trust instrument.

[¶ 29]  Appellants also point to a number of gifts from the Colonel to William Siebrandt in the last years of the Colonel's life. The record shows, however, that the Colonel was in the habit of making large gifts to Siebrandt over the course of his life. An examination of the Colonel's net worth at the time shows that, while the gifts were substantial (sometimes approaching a million dollars at a time), the Colonel's net worth at that time ranged between $50 and $100 million. Gifts of 1% of the Colonel's total estate to his primary caretaker and closest friend are not unusual or out of character enough to serve as convincing evidence that his will was overthrown.

[¶ 30]  "In ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Bitker v. First Nat'l Bank in Evanston*, 2004 WY 114, ¶ 11, 98 P.3d 853, 855–56 (Wyo.2004) (internal citation and quotation marks omitted). "Clear proof of undue influence is required to render a will voidable." *Loomis*, 810 P.2d at 128 (quoting *Macaraeg v. Wilson*, 749 P.2d 272, 277 (Wyo.1988)). Given the state of the evidence discussed above, *see supra* ¶¶ 16–29, Appellants have failed to raise an issue as to at least three of the factors required to show undue influence. Appellants have failed to make any showing that the Colonel was in a condition that permitted subversion of his will. They have further failed to show that there was activity on the part of Siebrandt or Zarate with respect to the trust instrument.

> It is not sufficient to show that a party benefited by a will had the motive and the opportunity to exert such influence but there must be evidence that he did exert it and did so control the actions of the testator that the instrument is not really the will of the testator.

*Estate of Draper*, 374 P.2d 425, 431–32 (Wyo. 1962). There is no evidence that either of them unduly profited as beneficiary under the trust. Siebrandt, who arranged for the Colonel's continued care and was his closest companion in the last years of his life, inherited the Colonel's house and enough securities to bring the bequest to a capped total value of $1.5 million. The majority of the Colonel's assets were bequeathed to various charities and individuals, with his residual estate going to the University of Wyoming, of which he had long been a benefactor. Zarate is not a beneficiary under the trust.

[¶ 31]  Appellants are at a disadvantage in this litigation, in part because none of them had seen or had regular contact with the Colonel for more than 30 years. Appellees, on the other hand, had visited the Colonel regularly (some daily) in his last years, and they were able to provide evidence accordingly. Appellants have not provided enough

evidence to raise a material fact with regard to undue influence.

### 3. *Forgery*

[¶ 32] Appellants also attack the 2002 trust on the basis that the Colonel's signature on the document is a forgery. The Colonel's signature on that trust is notarized. Under Wyo. Stat. Ann. § 32–1–107 (Lexis-Nexis 2007), "the certificate of a notary public over his hand and official seal, shall be received as presumptive evidence of the facts contained in such certificate; provided, that any person interested as a party to a suit may contradict, by other evidence, the certificate of a notary public." "Cases considering this provision have applied the well-settled rule that, to rebut the presumption that the facts contained in the notary's certification are true, the challenging party must provide cogent, clear and convincing evidence of their falsity." *Wayt v. Urbigkit*, 2007 WY 34, ¶ 11, 152 P.3d 1057, 1060 (Wyo.2007).

[¶ 33] The notary whose signature and seal appear on the 2002 trust testified, as we noted above, that she remembered the Colonel and remembered notarizing his document. *See supra* ¶ 25. The notary also testified about her customary procedure for notarizing a document, which included reviewing the document for completeness, inspecting valid state identification, witnessing the client's signature, and having the client separately sign a notary journal. She explained that her procedure for notarizing a jurat (which is what the notary certificate on the 2002 trust contained) required her to witness the act of signing, and that she would have a client resign the document if it were brought in to her with a signature already affixed.

[¶ 34] As discussed above, Appellee Charles Graves stated that he prepared the trust at the Colonel's direction, that he dealt directly with the Colonel on the matter, and that he believes the 2002 trust reflects the Colonel's wishes. *See supra* ¶ 21. The Colonel returned the trust to Mr. Graves after it was notarized, and Mr. Graves held it until the Colonel's death in 2003.

[¶ 35] Appellants offered the report of a forensic document examiner to refute the presumption in favor of the information (including the identification of the signer) in the notary certificate. The document examiner's report is not well-worded, and refers to signatures in the body of the trust and to notarized signatures. It appears to conclude that the notarized signature is genuine, while the signatures found elsewhere in the trust are not genuine. This is the only evidence Appellants have produced on this matter. This is not enough to raise a genuine issue of material fact with respect to the authenticity of a notarized signature given the testimony of the notary, the corroboration provided by the decedent's lawyer that the trust was legitimate, and the fact that the 2002 trust appears to be congruous with the testamentary scheme pursued by the Colonel throughout his life.

## CONCLUSION

[¶ 36] The district court did not abuse its discretion when it denied Appellants' request to amend their Complaint. The district court properly summarily disposed of Appellants' claims when they failed to produce enough evidence to raise a genuine issue of material fact on any claim. We affirm.