# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 48

APRIL TERM, A.D. 2014

April 11, 2014

MARIAN I. ERDELYI,

Appellant
(Plaintiff),

v.                                                                          S-13-0116

BRADLEY T. LOTT,

Appellee
(Defendant).

*Appeal from the District Court of Teton County*
The Honorable Timothy C. Day, Judge

*Representing Appellant:*
        C.M. Aron and Galen B. Woelk of Aron and Hennig, LLP, Laramie, Wyoming.
        Argument by Mr. Woelk.

*Representing Appellee:*
        James K. Lubing and Leah K. Corrigan of Lubing & Corrigan, LLC, Jackson,
        Wyoming.  Argument by Ms. Corrigan.

*Before KITE, C.J., and HILL, VOIGT\*, BURKE, and DAVIS, JJ.*

*\*Justice Voigt retired effective January 3, 2014.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.
Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building,
Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made
before final publication in the permanent volume.

**KITE, Chief Justice.**

[¶1] Marian I. Erdelyi filed an action against her stockbroker, Bradley T. Lott, for fraud and constructive fraud. After a trial, a jury found that Mr. Lott committed constructive fraud but that Ms. Erdelyi knew or in the exercise of due diligence should have known before February 10, 2007, that the fraud had occurred. Based on the jury's findings, the district court entered judgment holding Ms. Erdelyi's claims were barred by the statute of limitations and dismissed the action.

[¶2] On appeal, Ms. Erdelyi contends the district court erred in instructing the jury on negligence and comparative fault in this fraud action. She also asserts the district court erred in instructing the jury, for purposes of applying the statute of limitations, to determine whether she knew or should have known with the exercise of due diligence before February 10, 2007, that the fraud had occurred, because there was no evidence to support the instruction. We hold that when the law is properly applied, the evidence did not support a finding that Ms. Erdelyi could have discovered the fraud sooner and it was error to dismiss the case based on the statute of limitations. We, therefore, reverse the judgment and remand for a new trial.

## ISSUES

[¶3] Ms. Erdelyi states the issues for this Court's determination as follows:

> Whether the trial court's jury instructions, taken as a whole, misstated the law in the following particulars:
>
> (A)    By instructing the jury to compare a victim's fault on a claim of fraud, and including the victim on the verdict form;
>
> (B)    By imposing a negligence standard on [Ms. Erdelyi] with regard to discovery of her stockbroker's fraud; and
>
> (C)    By instructing the jury to determine the date [Ms. Erdelyi] discovered her stockbroker's fraud, when there was no evidence of any such discovery presented.

Mr. Lott asserts the district court properly instructed the jury.

1

# FACTS

[¶4]  Ms. Erdelyi was the only child of S. Isabel Sprankle.  Ms. Sprankle and Ms. Erdelyi were joint tenants with rights of survivorship on an investment account.  Pursuant to the account agreement, either joint tenant had the authority to independently make purchases and sales or withdraw money from the account unless one of them terminated that authority in writing.  Ms. Sprankle contributed all of the funds held in the account.

[¶5]  In 1999, Mr. Lott, a financial advisor employed by UBS/Paine Webber in Michigan, took over as manager of the joint account for Ms. Sprankle and Ms. Erdelyi.  At the time, Ms. Sprankle was eighty-one years old and both she and her daughter were living in Laramie, Wyoming.  Although Mr. Lott and Ms. Sprankle did not meet face-to-face until later, they were by 2001 having regular telephone contact, sometimes speaking with each other several times per week.

[¶6]  According to Mr. Lott's client contact report, Ms. Sprankle shared with him quite early in their relationship that she and her daughter did not have a good relationship.  Mr. Lott quickly befriended Ms. Sprankle, sending her cards and gifts, expressing his desire to be friends over and above being her broker and listening to her complaints about her daughter.  He also offered to find an attorney in Wyoming for her to discuss setting up a trust.  According to his contact report, Mr. Lott made the offer to find an attorney for Ms. Sprankle in February of 2001, after she told him she did not want her daughter to inherit her money.

[¶7]  During this same time frame, Mr. Lott persuaded Ms. Sprankle and Ms. Erdelyi to transfer to him additional accounts they held as joint tenants with rights of survivorship.  Ms. Erdelyi requested in writing that Mr. Lott contact her before making any transactions with respect to the accounts.  Mr. Lott agreed to do as she requested.  Although he knew at the time that Ms. Sprankle did not want her daughter to have control of the accounts and, in fact, wanted her name taken off the accounts, he did not disclose that information to Ms. Erdelyi.

[¶8]  By April or May of 2001, despite his earlier agreement to talk with her before making any transactions involving the joint accounts, Mr. Lott stopped talking with Ms. Erdelyi about what was happening with the joint accounts.  He specifically did not tell her that Ms. Sprankle was contemplating transferring them to a trust.  He also did not advise Ms. Erdelyi that he would not be contacting her concerning the accounts.  Mr. Lott continued, however, to work with Ms. Erdelyi to have her transfer her individual accounts to him.  Meanwhile, Mr. Lott referred Ms. Sprankle to Clay Geittmann in Jackson, Wyoming for purposes of setting up a trust.  By May of 2001, Mr. Lott was continuing to communicate with Ms. Erdelyi about her accounts without informing her that he had referred her mother to a lawyer to begin discussions about transferring the joint accounts into a trust.

[¶9]   In the summer of 2002, Ms. Sprankle began talking about moving back to Michigan.  Over the course of the next ten months, Mr. Lott took it upon himself to look for a place for Ms. Sprankle to live and sent her pictures of places he thought she might want to consider.  According to his client contact report, Ms. Sprankle asked him to fly to Wyoming and drive her back to Michigan.  Mr. Lott declined but agreed to help with the logistics of the move as much as he could.  In fact, Mr. Lott took an active role in assisting Ms. Sprankle in moving to Michigan.

[¶10]   In August of 2001, Ms. Sprankle informed Mr. Lott that she wanted him to be a beneficiary of her trust.  He understood from what she told him that she intended to make a few minor gifts to others, but wanted him to receive the balance of her estate.  Mr. Lott did not tell Ms. Erdelyi about her mother's plans nor did he tell Ms. Erdelyi that he could not discuss her mother's plans with her.

[¶11]   In September of 2001, Ms. Sprankle met with Mr. Geittmann.  She advised Mr. Geittmann that she wanted to appoint Mr. Lott as her trustee upon incapacity and her agent for purposes of her durable power of attorney and power of attorney for healthcare.  She also informed Mr. Geittmann that she wanted to make Mr. Lott the beneficiary of her trust to the exclusion of her daughter.  She told Mr. Geittmann that Mr. Lott was "her close friend" and she wanted to "reward him for his kindness, friendship and support throughout the years."  At the time Ms. Sprankle made these statements, she had not met Mr. Lott in person and, according to Mr. Lott's client contact reports, had been in regular contact with him by telephone for less than a year.

[¶12]   Also in September, Mr. Lott forwarded to Mr. Geittmann a letter of authorization for Ms. Erdelyi's signature allowing the transfer of the joint investment accounts into the trust.  Mr. Geittmann induced Ms. Erdelyi to sign the letter of authorization by telling her that she and her mother would realize substantial tax savings by having the joint accounts in the name of the trust.  No one informed Ms. Erdelyi that her mother's intention was to disinherit her, that Ms. Sprankle was making Mr. Lott her primary beneficiary, or that by signing the letter of authorization, Ms. Erdelyi was giving up her joint ownership rights.  Even when Ms. Erdelyi called Mr. Lott in October of 2001, and specifically asked about the trust, he did not tell her that Ms. Sprankle planned to disinherit her and make him the primary beneficiary of her trust.  He also did not tell Ms. Erdelyi that her mother had instructed him not to discuss her plans for the trust with her daughter.  According to Ms. Erdelyi, sometime in September or October, Mr. Lott told her that she was the primary beneficiary of the trust.

[¶13]   In December of 2001, UBS/Paine Webber was designated as Ms. Sprankle's successor trustee.  Subsequently, in March of 2002, Mr. Lott forwarded a letter to Mr. Geittmann that he (Mr. Lott) had written to Ms. Sprankle confirming a conversation in which, according to Mr. Lott, she told him that she did not want him or UBS/Paine

3

Webber to disclose to Ms. Erdelyi the details of her trust, and specifically the fact that she had designated Mr. Lott as her beneficiary. The letter went on to state that Mr. Lott also managed Ms. Erdelyi's financial assets and UBS/Paine Webber deemed it "imperative that [Ms. Erdelyi] be made aware that [Mr. Lott is] a beneficiary to your trust." The letter stated further that Mr. Lott understood Ms. Sprankle did not want her daughter to know this information and he would honor Ms. Sprankle's request to not disclose her wishes to her daughter.

[¶14] After receiving the letter from Mr. Lott, Mr. Geittmann crossed out the following lines:

> However, I have been advised by my firm's compliance department to have your attorney prepare a document directing UBS Paine Webber and me not to disclose any information about your trusts, my being a beneficiary or other personal information that you do not want made available to your daughter Marian.
>
> We should follow up with it all to [Mr. Geittmann] to have this document drafted and sent to my boss so that he can pass it along to the compliance department to assist in carrying out your trust's directives.

Mr. Lott sent the letter to Ms. Sprankle as revised.

[¶15] Mr. Geittmann sent a letter dated the same day to Mr. Lott's boss advising him that:

> Ms. Sprankle prohibits UBS Paine Webber, Inc., and any of its agents, employees, brokers or representatives from discussing the terms of Ms. Sprankle's estate planning with her daughter, Marian I. Erdelyi, or otherwise informing Ms. Erdelyi about any of the provisions of Ms. Sprankle's estate planning. As a result of the rift that has grown between Ms. Sprankle and her daughter, Ms. Erdelyi, Ms. Sprankle has elected to leave the majority of her estate to her friends, and to virtually disinherit Ms. Erdelyi. Furthermore, Ms. Sprankle again reiterated to me that she made the decision to benefit [Mr.] Lott, her financial planner, as a result of the kindness and friendship that he [has] shown her over the years, and not as a result of any persuasion on the part of Mr. Lott.

4

At trial, Mr. Geittmann was not able to say whether he confirmed with Ms. Sprankle that those were her wishes before sending the letter in March of 2002. At the time Mr. Geittmann sent the letter referencing Mr. Lott's friendship with Ms. Sprankle "over the years," Mr. Lott and Ms. Sprankle had still not met face-to-face and had been in regular contact by telephone for just over one year.

[¶16] In May of 2002, Ms. Sprankle moved back to Michigan and into an apartment Mr. Lott had found for her. Mr. Lott picked her up at the airport and assisted her with the move. Once Ms. Sprankle was in Michigan, the relationship she and Mr. Lott had developed over the telephone grew closer, with Mr. Lott devoting considerable time to assisting and caring for Ms. Sprankle in numerous ways.

[¶17] In mid-July of 2003, Ms. Erdelyi contacted Mr. Lott, stating that she had not heard from her mother since early June and her mother had not wanted to see her when she was in Michigan earlier that year. Ms. Erdelyi thanked Mr. Lott for looking after her mother and asked that he let her know if any problems arose. Mr. Lott responded, saying that he had not prevented Ms. Erdelyi from seeing her mother and that he could not discuss Ms. Sprankle with her because he had received a "stern" letter from Mr. Geittmann prohibiting him from doing so. He did not disclose that Mr. Geittmann wrote the letter only after reviewing a similar letter Mr. Lott had written to Ms. Sprankle.

[¶18] Ms. Erdelyi had no further contact with Mr. Lott until November 2003 when she wrote to him about her individual accounts. Mr. Lott responded with the suggestion that she work with another broker. In her reply, Ms. Erdelyi expressed concern that Mr. Lott had ignored her account and avoided communication with her for five months. She also asked him to clarify his relationship with her mother, noting that finding her mother an apartment and helping her move were beyond his responsibilities as her broker. Ms. Erdelyi asked specifically whether Mr. Lott held any powers of attorney to act as her mother's agent and whether he had been appointed to act as executor of any will or trust her mother might have. Mr. Lott never responded.

[¶19] In 2005, Ms. Erdelyi traveled to Michigan. She visited her mother and tried to see Mr. Lott but was told he was out of the office. In 2006, Ms. Erdelyi sent Mr. Lott a letter asking him to let her know if her mother became ill or passed away and thanking him for looking after her mother. Again, Mr. Lott did not respond.

[¶20] In August of 2009, Ms. Sprankle was declared incompetent and was quite ill. A friend of hers contacted Ms. Erdelyi who then traveled to Michigan to be with her mother. Ms. Erdelyi asked Mr. Lott for a copy of the power of attorney. Mr. Lott refused to provide any documentation to her and contacted Mr. Geittmann. Mr. Geittmann then wrote a letter advising Ms. Erdelyi that neither he nor her mother's successor trustees were allowed to provide any information concerning the trust "to any person who is not a current beneficiary of the trust, and since your mother is the sole

5

current beneficiary of the trust, this would preclude any dissemination of the actual estate planning documents or statements of the trust assets to you." Mr. Geittmann requested that Ms. Erdelyi make no further requests for information about the trust during Ms. Sprankle's lifetime.

[¶21] Ms. Sprankle died on October 6, 2009. Ms. Erdelyi learned that she was not a beneficiary of her mother's trust when she received a copy of the trust after her mother's death. Pursuant to the terms of the trust, Mr. Lott received $245,000 in securities and over $300,000 in cash from Ms. Sprankle's estate.

[¶22] In February of 2011, two years and four months after learning she had been disinherited, Ms. Erdelyi filed a complaint against Mr. Lott for fraud and constructive fraud.[1] She claimed that he failed to disclose material facts and induced her to sign the letter of authorization, thereby giving up her ownership rights to the assets in the joint accounts. She further claimed she had a special relationship of trust and confidence with Mr. Lott by virtue of his position as her investment adviser and he had a duty to disclose any conflicts between her interests and his and obtain fully informed consent from her before engaging in transactions to his benefit involving accounts in which she had an ownership interest.

[¶23] The case went to trial before a jury. At the close of the evidence, the district court instructed the jury concerning the law. Among the instructions given were the following:

INSTRUCTION NO. 16

Constructive fraud is defined as consisting of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another, and exists where such conduct, although not actually fraudulent, ought to be so treated when it has the same consequences and legal effects.

INSTRUCTION No. 17

In considering whether constructive fraud occurred, you must determine whether Defendant had a duty to Plaintiff and, if so, whether it was breached. What is known as an informal fiduciary duty may be established if a special relationship of trust and confidence existed between

---

[1] In addition to Mr. Lott, Ms. Erdelyi named Mr. Geittmann as a defendant. By joint stipulation of the parties, the district court entered an order dismissing him from the action. The complaint also alleged a third cause of action against Mr. Lott— breach of agent duties—which Ms. Erdelyi dropped before trial.

Defendant and Plaintiff. Such a duty arises where one party has undertaken to gain the confidence of another and purported to act or advise with the other's interests in mind. The express reposing of trust and confidence by one party in another is not enough to create a fiduciary duty. The duty arises from the conduct of the purported fiduciary where 1) the other party reposes confidence in the integrity of the purported fiduciary, and 2) the purported fiduciary voluntarily assumes and accepts the confidence in advising the other party.

Fiduciary relationships are extraordinary and not easily created. They cannot be the product of wishful thinking, because they carry significant legal relationships.

In determining whether a fiduciary duty arose due to a relationship of trust and confidence, you should consider the factual situations surrounding the involved transactions in this matter and the relationship of the parties to each other and to the transactions.

If you determine that Defendant owed Plaintiff such a duty, it is for you to determine whether Defendant breached that duty by his acts, omissions, and concealments.

## INSTRUCTION NO. 19

A person has the duty to take reasonable steps under the circumstances to reduce her injuries and damages. Any damages resulting from a failure to take such reasonable steps cannot be recovered.

## INSTRUCTION NO. 21

Your verdict must be determined on the basis of the comparative fault of the parties themselves and certain other individuals and entities who are not parties to this case. Even though certain of the individuals and entities named on the verdict form have not appeared or offered evidence, it is necessary that you determine whether each of them was at fault in the events at issue and determine the percentage of fault which is attributable to each of them. The party claiming the fault of these "non-party actors" has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove that any such individual was at fault

7

and that such fault contributed to the damages claimed to have been suffered.

A party or non-party actor is at fault when that individual is negligent or acts willfully or wantonly and that individual's negligence or willful and wanton action is a cause of the damages for which the claim is made. The terms negligence, willful and wanton, and cause are explained in other instructions.

The verdict form provided to you includes spaces for you to record your determination of the percentage of fault of each of the parties and each of the non-party actors. It also contains a space for you to record your determination of the total damages sustained.

If you find that Plaintiff is fifty percent at fault or less, then you should fill in the total amount of damages, if any, on the verdict form. Do not reduce your determination of total damages by any percentage of fault you have attributed to the Plaintiff, the Defendant, or any of the non-party actors.

The Court, and not the jury, will reduce the total amount of damages by the percentage of fault you may attribute to the Plaintiff and other non-party actors.

In explaining the consequences of your verdict, the Court has not meant to imply that any person is at fault. That is for you to decide, in conformity with these instructions.

INSTRUCTION NO. 23

When the word negligence is used in these instructions, it means the failure to use ordinary care. Ordinary care means the degree of care which should reasonably be expected of the ordinary careful person under the same or similar circumstances. The law does not say how such an ordinary person would act. That is for you to decide.

The party seeking to prove negligence must prove it by a preponderance of the evidence.

A "preponderance of the evidence" is defined as the amount of evidence, taken as a whole, that leads the jury to find that the existence of a disputed fact is more probable than not. You should understand that "a preponderance of the evidence" does not necessarily mean the greater number of witnesses or exhibits.

8

INSTRUCTION NO. <u>25</u>

If you were to decide that fraud occurred in this case, then you will be asked to decide when the Plaintiff discovered the fraud. Discovery of the fraud is determined by when the injured party knew, or should have known through the exercise of due diligence, that the fraud occurred.

[¶24] The district court gave the jury the following verdict form:

1. Do you find that Bradley Lott committed a fraudulent misrepresentation of a material fact as defined by the Court in Instruction 12?

_____          _____
Yes                           No

Please proceed to question 2.

2. Do you find that a special relationship of trust and confidence existed between Bradley Lott and Marian Erdelyi, as defined in the Court's Instruction 17?

_____          _____
Yes                           No

If you answered yes to question 2, please proceed to question 3, below. If you answered no to question 2 and no to question 1, please sign the form and return it to the Bailiff, who will then return it to the Court. If you answered no to question 2 but yes to question 1, please proceed to question 4 below.

3. Having found a special relationship of trust and confidence between the parties, did Bradley Lott breach his duty of honest advice and full disclosure, as defined in Instruction 17?

_____          _____
Yes                           No

If you answered yes to question number 3, then go on to question number 4, below. If you answered no to question

9

number 3, but yes to question number 1, then proceed to question 4, below. If you answered no to questions 1 and 3, please sign the verdict form, and deliver it to the Bailiff who will then deliver it to the Court.

4. Having found that Defendant committed fraud, do you find that, before February 10, 2007, the Plaintiff, Marian Erdelyi, knew or should have known in the exercise of due diligence, that the fraud alleged against Defendant, Bradley Lott, occurred?

_____          _____
Yes                No

If you answered yes to question number 4, please sign the verdict form and give it to the Bailiff who will then deliver it to the Court. If you answered no to question number 4, go on to answer question number 5, below.

5. Having found fraud by answering "yes" to question 1 and/or questions 2 and 3, did Marian Erdelyi suffer damage as a result of the fraudulent misrepresentation and/or constructive fraud committed by Bradley Lott?

_____          _____
Yes                No

If you answered yes to question number 5, then go on to the questions below. If you answered no to question number 5, please sign the verdict form, and deliver it to the Bailiff who will then deliver it to the Court.

COMPARATIVE FAULT

6. Do you find that the acts or omissions constituting fault by Attorney Clay Geittmann were a substantial factor in bringing about damage to Marian Erdelyi?

_____          _____
Yes                No

7. Do you find that acts or omissions constituting fault of UBS/PaineWeber were a substantial factor in bringing about damage to Marian Erdelyi?

10

_____      _____
Yes          No

8. Do you find that Marian Erdelyi's own acts or omissions constituting fault were a substantial factor in bringing about damages to herself?

_____      _____
Yes          No

9. Assuming the total percentage of fault to be 100%, what percentage of the fault do you attribute to each of the following? (Your percentages must total 100%):

Marian Erdelyi _____%

If plaintiff's percentage of fault is greater than 50%, please sign the verdict form and return it to the Bailiff, who will then return it to the Court. If Plaintiff's percentage of fault is less than 50%, please proceed to the questions below.

    Attorney Clay Geittmann _____%
    Bradley Lott _____%
    UBS/PaineWebber _____%

10. What do you find to be the total amount of damage suffered by Plaintiff Marian Erdelyi? (Do not reduce by the percentage of fault you found. The Court will reduce this amount by any percentage of fault you attribute to other actors.)

$_____

The jury answered question 1 "No" and questions 2, 3 and 4 "Yes". In accordance with the verdict form instruction, having answered question 4 "Yes" the jury signed the verdict form without answering the remaining questions. The district court entered judgment on the jury verdict holding that Ms. Erdelyi's claims were barred by the statute of limitations. Ms. Erdelyi timely appealed to this Court.

**STANDARDS OF REVIEW**

[¶25] We conclude the statute of limitations question is dispositive of this appeal. The application of a statute of limitations is a mixed question of law and fact when the

11

material facts are in dispute; otherwise, it is a question of law. *Redland v. Redland*, 2012 WY 148, ¶ 54, 288 P.3d 1173, 1187 (Wyo. 2012).

## DISCUSSION

### 1. *Evidence that Ms. Erdelyi Discovered the Fraud*

[¶26]   Although the jury found that Mr. Lott committed fraud, it then found that Ms. Erdelyi "knew or should have known" before February 10, 2007, that the fraud occurred. Ms. Erdelyi contends there was no evidence to support that conclusion. A cause of action for fraud is not deemed to have accrued until the discovery of the fraud. Wyo. Stat. Ann. § 1-3-106 (LexisNexis 2013). We have interpreted the words "until the discovery of the fraud" to mean from the time the fraud was known or "<u>could have been discovered</u> in the exercise of reasonable diligence." *Retz v. Siebrandt*, 2008 WY 44, ¶ 12, 181 P.3d 84, 89-90 (Wyo. 2008), quoting *Mason v. Laramie Rivers Co*., 490 P.2d 1062, 1064 (Wyo. 1971) (emphasis added).

[¶27]   Applying this meaning in *Retz*, we held a claim for conversion was barred by the four year statute of limitations because the conversion could easily have been discovered. There, the claimants' mother jointly held a brokerage account with the deceased. They claimed that prior to his death the deceased used a fraudulent document to withdraw securities from the joint account. They attempted to bring a claim for conversion thirteen years after the withdrawal and the district court concluded it was barred by the statute of limitations. This Court affirmed, stating that "[a] simple inquiry at the brokerage would have shown [the mother] that the account had been emptied." *Id*., ¶ 13, 181 P.3d at 90. Because the mother could easily have discovered the conversion, the action brought thirteen years later was barred.

[¶28]   In *Mason*, the Court dismissed a claim for fraud based on the four year statute of limitations. There, corporate stockholders filed an action in 1969 alleging that the transfer of stock to another stockholder six years earlier was fraudulent. The district court held the action was barred by the statute of limitations. This Court affirmed, finding that the claimant stockholders had voted personally or by proxy at the meeting in 1963 when the stock was transferred, the transfer had been challenged at the meeting by an attorney stockholder who attached a letter to the minutes protesting the transfer and the corporate books showed the transfer two months later. The Court held the action was barred by the statute of limitations because the stockholders had access to and the right to examine the corporate records and could easily, therefore, have discovered the fraud within four years of the stock transfer.

[¶29]   In both *Mason* and *Retz*, the Court held actions filed after the four year statutes of limitation were barred because the claimants were legally entitled to the information and could easily access it. If the claimants' mother in *Retz* had inquired at the brokerage, she

would have discovered the account was empty. Similarly, if the stockholders in *Mason* had examined the corporate records, they would have discovered the fraudulent transfer.

[¶30] In contrast to *Mason* and *Retz*, the instruction in the present case did not ask the jury to determine whether Ms. Erdelyi in the exercise of due diligence "could have discovered" the fraud. Instead, the instruction asked the jury to determine whether Ms. Erdelyi knew or with the exercise of due diligence should have known about the fraud. As proof that Ms. Erdelyi should have known, the defense attempted to show that all she had to do was ask her mother about the terms of her trust or her relationship with Mr. Lott, or hire a lawyer. On cross-examination, defense counsel questioned Ms. Erdelyi as follows:

> Q.    . . . you didn't call your mother and ask her what was going on, did you?
> A.    I'm not sure when I called my mother, but would I have called her about this, no.
> Q.    You wouldn't call and say why is this guy being so nice to you, that didn't occur to you in 2003? Yes or no?
> A.    In that context, I would not have called her.
> Q.    I mean your position in this case is, among other things, that . . . Mr. Lott concealed things about the trust and Mr. Lott's relationship with your mother and whatnot for a period of better than half a decade; isn't that true?
> A.    Yes.
> Q.    And you had the ability to call your mother up and ask her what was going on anytime from the time she left Laramie until she became incompetent; isn't that true?
> A.    Yes.
> Q.    And you never asked if Mr. Lott, why he was being so nice, is she going to make him a beneficiary, you never asked any of those questions, did you?
> A.    No.
> Q.    And even in 2005 when she gave you a hug and whatnot you decided not to ask her, correct?
> A.    It was not a subject that was mutually agreeable to either one of us and I was not –
> Q.    You –
> A.    -- going to question her.
> Q.    Okay. But you could have, correct?
> A.    Yes.

[¶31] The defense also questioned Ms. Erdelyi as follows:

Q. Why don't you – you could have hired a lawyer at the point, correct?
A. Yes.
. . . .
Q. And you could have hired a lawyer on the basis of how come these people won't tell me anything, correct?
A. I would assume so, yes.
Q. Yeah, but you didn't, correct?
A. Correct.
Q. And I mean if you really wanted to find out what was going on and if you were going to use due diligence to find out what was going on you would have hired a lawyer or at least talked to a lawyer and told him about this scenario, correct?
A. I could have, yes.

Defense counsel returned to the issue later when he asked Ms. Erdelyi whether in hindsight the reasonable thing to have done would have been to hire a lawyer. Ms. Erdelyi responded, "In hindsight, yes. At the time, no."

[¶32] The problem with the defense theory that Ms. Erdelyi could have discovered the fraud by talking with Ms. Sprankle or hiring a lawyer is that it assumes such action would have disclosed the fraud. No evidence was presented to support that assumption. With regard to asking her mother, the evidence suggests Ms. Sprankle likely would not have discussed her relationship with Mr. Lott or her estate plans with Ms. Erdelyi. As for seeking legal advice, one can only speculate as to what the outcome might have been. While Mr. Lott's fraud might have been discovered, a lawyer might also have advised Ms. Erdelyi that she had no recourse until she was able to obtain a copy of the trust upon her mother's death.

[¶33] In any event, unlike the circumstances in *Mason* and *Retz*, no evidence was presented to show that if Ms. Erdelyi had asked her mother or if she had gone to a lawyer she could have discovered the fraud. Likewise, unlike *Mason* and *Retz*, no evidence was presented to show that Ms. Erdelyi was legally entitled to and had access to information about the trust or Mr. Lott's relationship with her mother. In fact, the evidence presented showed that information concerning Ms. Sprankle's trust and relationship with Mr. Lott was actively concealed from Ms. Erdelyi.[2]

---

[2] Some courts have held that the statute of limitations governing actions for fraud is tolled if the perpetrator takes affirmative action to conceal the fraud, and the statute only begins to run when the fraud is discovered; that is, when damage is sustained and objectively capable of ascertainment. *See generally* 54 CJS Limitation of Actions § 276. Other courts have held that when a fiduciary or confidential relationship exists between the parties, failure to exercise due diligence to discover the fraud does not toll

[¶34]  As support for the jury's finding that Ms. Erdelyi "knew or should have known" about the fraud, Mr. Lott points to Ms. Erdelyi's testimony that "you would have to be comatose" not to have been suspicious of Mr. Lott's relationship with Ms. Sprankle by the mid-2000s.  Mr. Lott also points to Ms. Erdelyi's letter of 2003 in which she asked Mr. Lott whether he held any powers of attorney for her mother.  Additionally, he stresses Ms. Erdelyi's poor relationship with her mother, her failure to ask her mother about her estate plan and a letter she received from UBS/Paine Webber in 2003 refusing to provide information to her concerning the accounts or trust.[3]  Under *Mason* and *Retz*, this evidence does not support a finding that with the exercise of due diligence Ms. Erdelyi could have discovered the fraud.  While there is no question Ms. Erdelyi was suspicious and concerned about the relationship, she testified that it did not occur to her that her mother had made Mr. Lott, rather than her daughter, her primary beneficiary until close to the time of her mother's death.  More importantly, there was no showing information that would have revealed the fraud was accessible to Ms. Erdelyi prior to her mother's death or that she was legally entitled to it. To the contrary, her efforts to obtain information were met with active concealment by Mr. Lott and others.  Under these circumstances, the evidence did not support dismissal of the case on the basis of the statute of limitations.

[¶35]  The statute of limitations issue is dispositive of this appeal.  On remand for a new trial, however, the issues relating to the jury instructions and verdict form are likely to rise again.  We, therefore, address Ms. Erdelyi's claim that it was error to instruct the jury concerning negligence and comparative fault, and place her name on the verdict form for the jury to allocate her percentage of fault. *See Glenn v. Union Pacific R. Co.*, 2011 WY 126, ¶ 30, 262 P.3d 177, 191 (Wyo. 2011), in which the plaintiff's first issue was dispositive of the appeal, but we addressed the second issue because it was likely to rise again in the new trial.

### 2.  *Jury Instructions on Negligence and Comparative Fault*

[¶36]  Ms. Erdelyi contends it was error to give the negligence and comparative fault instructions because it suggested that the act or omission of a victim of fraud could be the proximate cause of someone else's fraudulent act and the victim could be at fault for the fraud.  She also asserts the instructions confused the jury by mixing the concepts of negligence and fraud, which have different standards of proof.  She further contends the instructions confused the jury by improperly introducing the concept of negligence when there was no claim or counter-claim for negligence in this constructive fraud case.

---

the statute of limitations.  *Id.*, § 277.  Ms. Erdelyi did not raise either of these issues in the district court and so we do not address them.

[3] The letter, although apparently introduced into evidence at trial, is not part of the record on appeal.  We, therefore, do not consider it.

[¶37] Wyoming's comparative fault statute provides in relevant part as follows:

**§ 1-1-109. Comparative fault.**

(a) As used in this section:

(i) "Actor" means a person or other entity, including the claimant, whose fault is determined to be a proximate cause of the death, injury or damage, whether or not the actor is a party to the litigation;

(ii) "Claimant" means a natural person, including the personal representative of a deceased person, or any legal entity, including corporations, limited liability companies, partnerships or unincorporated associations, and includes a third party plaintiff and a counterclaiming defendant;

(iii) "Defendant" means a party to the litigation against whom a claim for damages is asserted, and includes third party defendants. Where there is a counterclaim, the claimant against whom the counterclaim is asserted is also a defendant;

(iv) "Fault" includes acts or omissions, determined to be a proximate cause of death or injury to person or property, that are in any measure negligent, or that subject an actor to strict tort or strict products liability, and includes breach of warranty, assumption of risk and misuse or alteration of a product;

(v) "Injury to person or property," in addition to bodily injury, includes, without limitation, loss of enjoyment of life, emotional distress, pain and suffering, disfigurement, physical or mental disability, loss of earnings or income, damage to reputation, loss of consortium, loss of profits and all other such claims and causes of action arising out of the fault of an actor;

[¶38] In *Board of County Comm'rs of Teton Co. v. Bassett*, 8 P.3d 1079, 1084 (Wyo. 2000), a negligence action, this Court held that Wyo. Stat. Ann. § 1-1-109 requires that "all species of culpable conduct" be compared in assessing fault. There, the plaintiffs were injured when a suspect fleeing from law enforcement ran a roadblock and crashed into their vehicle at a high rate of speed. Prior to the crash, law enforcement had waved the plaintiffs through the roadblock and onto the highway in front of the suspect without warning them that the suspect was speeding down the highway toward them. The plaintiffs brought an action against the officers alleging they were negligent for failing to warn them about the approaching vehicle. The issue was whether the suspect, a non-

16

party actor, should be included on the verdict form so that his willful conduct could be compared with the officers' negligence.

[¶39]   In holding that the suspect must be included on the verdict form, the Court concluded that by using the word "fault" rather than negligence in § 1-1-109 and including strict and products liability, the legislature intended to broaden the scope of the statute to include willful conduct.  The Court further concluded that the adoption of § 1-1-109 and the elimination of joint and several liability showed the legislature's intent to limit a tortfeasor's exposure to liability for the misconduct of other tortfeasors.   The Court said:

> To leave an actor such as [the fleeing suspect] out of the apportionment calculation exposes the remaining [defendants] to the possibility that they will be held to answer for his misconduct.  * * * The legislature has clearly opted to relieve joint tortfeasors of liability beyond that for which they bear proportional fault . . . .

*Bassett*, 8 P.3d at 1084.   Thus, under *Bassett*, a joint tortfeasor who acts willfully is properly included as an actor on a verdict form in a negligence case so that the jury can compare the defendant's negligence and the non-party actor's willful conduct and apportion liability.

[¶40]  Subsequently, in *Cathcart v. State Farm Mut. Auto Ins. Co.*, 2005 WY 154, ¶ 36, 123 P.3d 579, 592 (Wyo. 2005), this Court declined to decide whether comparative fault was a proper matter for a jury instruction in a bad faith case because the issue was not squarely raised or adequately argued.   That the Court declined to answer the question of whether § 1-1-109 encompasses bad faith suggests *Bassett* did not settle the issue and perhaps should not be read literally to include "all species of culpable conduct."   More recently, in *Strong Constr., Inc. v. City of Torrington*, 2011 WY 82, ¶ 126, 255 P.3d 903, 915 (Wyo. 2011), the Court held comparative fault was not applicable in a breach of contract action because the comparative fault statute applies to tort claims where a party is seeking personal injury or property damages caused by the fault of another, and breach of contract is not a tort claim.  *Cathcart* left open the question whether *Bassett* applies in the context of a bad faith case; *Strong* squarely held that § 1-1-109 does not apply in breach of contract cases.   Thus, *Bassett*'s holding that § 1-1-109 requires "all species of culpable conduct" to be compared is not as broad as that decision might suggest.

[¶41]  The holding in *Bassett* must be placed in context.   There, the issue was whether, under the comparative fault statute, the culpable conduct of a non-party tortfeasor must be compared with that of the defendants in a <u>negligence case</u>.  *Bassett* did not address whether, in an <u>intentional tort case</u>, the negligence of a non-actor should be compared with the willful conduct of the defendant.   More significantly for purposes of the present

17

case, Bassett did not address whether in an <u>intentional tort case</u> any <u>negligence on the part of the claimant</u> should be compared with the <u>willful act of the defendant</u>. Confined to its facts, *Bassett* addressed only whether a non-party actor whose willful acts were a proximate cause of the claimants' injuries should be compared with the defendants' negligence to apportion fault and liability. In that context, it makes sense to include the non-party actor because it ensures the negligent defendants are not held liable for the intentional acts of another. In that context, it seems clear the legislature sought to ensure negligent defendants would not be held accountable for the intentional acts of another. We are not persuaded the legislature intended negligence on the part of a fraud victim to be compared with the intentional acts of the perpetrator so as to reduce the perpetrator's liability based upon any percentage of fault apportioned to the victim.

[¶42]  Some courts have declined to apply comparative fault principles when to do so would be inconsistent with public policy. *Otero v. Jordan Rest. Enters,* 922 P.2d 569, 574 (N.M. 1996*),* citing *Reichert v. Atler*, 875 P.2d 379, 381 (N.M. 1994). Concluding it would be against public policy to allow the perpetrator of fraud to profit from his conduct, these courts have held comparative fault inapplicable in fraud cases.  *Id*. *See also Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 180-81 (Iowa 1990) (holding that instruction on comparative fault of plaintiff was properly denied to defendant guilty of fraud); *Cruise v. Graham*, 622 So.2d 37, 40 (Fla. Ct. App. 1993) (holding that denial of comparative fault instructions in fraud action was not error); *cf. Neff v. Bud Lewis Co.*, 89 N.M. 145, 149, 548 P.2d 107, 111 (Ct. App.) (holding contributory negligence was not a defense to a claim for negligent misrepresentation by building owner against real estate broker and salesmen having fiduciary relationship to plaintiff), *cert. denied*, 89 N.M. 321, 551 P.2d 1368 (1976); *Estate of Braswell v. People's Credit Union*, 602 A.2d 510, 515 (R.I. 1992) (holding comparative negligence principles inapplicable in action for negligent misrepresentation against credit union).

[¶43]  Unlike this Court's holding in *Bassett*, some of these courts have held that comparative fault does not apply in <u>any</u> intentional tort case. Despite this difference, we find their reasoning persuasive in the context of a fraud claim. One who has committed fraud should not be allowed to escape liability for his wrongful conduct by shifting the responsibility to the victim. Such a result is contrary to public policy. Absent clear statutory language showing the legislature intended the negligence of a fraud victim to be compared to the conduct of the perpetrator, thereby potentially reducing the latter's liability for his intentionally wrongful acts, we decline to hold that § 1-1-109 is a proper matter for a jury instruction in a fraud case. The district court erred in instructing on comparative fault and negligence so as to allow the jury to compare Mr. Lott's willful act with any negligence of Ms. Erdelyi in this constructive fraud case. The district court further erred in providing a verdict form requiring the jury to compare Mr. Lott's constructive fraud and any negligence of Ms. Erdelyi.

18

[¶44]  In reaching this result, we note also that the legislature has provided a mechanism for relieving the perpetrator of fraud from liability for his conduct when a jury finds that the victim did not use due diligence to discover the fraud.  As noted above in paragraph 26, the statute of limitations for fraud actions is triggered when a claimant knows or could have discovered the fraud in the exercise of due diligence.  *Mason*, 490 P.2d at 1064.  If a jury finds that a claimant knew or could have discovered the fraud more than four years before filing the action, the perpetrator of the fraud is relieved from any liability.  Thus, any "negligence" of the claimant in not discovering and timely pursuing a fraud claim is addressed in § 1-3-106.  There is no need for a separate instruction allowing a jury to compare a claimant's negligence or comparative fault with the willful act of the perpetrator in a fraud case.

[¶45]  On remand, the jury should not be instructed on negligence as to Ms. Erdelyi.  The jury also should not be instructed on comparative fault as between Ms. Erdelyi and Mr. Lott.

[¶46]  Reversed and remanded for a new trial.